We'll call the second case for the day, 17-50010, Wildman v. Medtronic, Wildman-Wildman, you could just wait a second until the crowd leaves. Okay. Whenever you're ready, counsel. Thank you, your honors. May it please the court. The spine stimulator injury is a industry, is a big business. It's not enough to get your device PMA approved. You've got to beat out the competition. And that's why Medtronic created this statement that's the gist of this case, the nine-year device life statements that's in the briefs. This is part of their marketing. It's part of their advertising. It's from their website. It was never, ever FDA approved. FDA never looked at it. They never approved it. They never cleared it. And while the middle statement you just made, they never looked at it. It's the record on appeal demonstrates that in the whole PMA process, the longevity of the component parts was never given to the FDA. But, your honor, I'm talking specifically about this statement that's on their website. Right. And I know that statement because it's prominent in the briefs. But my question to you is PMA processes are very lengthy. A huge amount of data is given. Is it your confident statement that nine-year longevity as to anything other than the battery was never given to the FDA? Well, your honor, that goes to one thing that's in the defendant's brief is what they actually submitted and what the FDA approved are statements, and this is page 7 of the defendant's brief. The labeling added that the battery can last for months or years. And then there is a statement that says battery life, nine years. And so what we're stating here in our case is, look, if you withhold that in your advertising, and in this statement that actually constitutes a warranty under Texas law, that is misleading. That is untrue. What they tell the consumers, like Mr. Wildman, is that our device is reliable. But it wouldn't be misleading or untrue, at least under preemption theory, had the FDA looked at it and said, you're right, not only the battery but all the rest of it. Well, if the FDA had cleared and approved this? Yes. Then we'd have no case. You know, if you're locked down, you're good. So doesn't it come back factually a little bit, take a deep dive, did the FDA get representations by Medtronic as to other parts of this device? And your answer is they didn't? Well, obviously they submitted the whole device to the FDA. But one of the gist of the defendant's argument, and they actually say this in page 12 of their brief, they say battery life is its device life. And that's contradicted by Medtronic's own statement in this nine-year device life statement. And bear in mind, under Texas law, a warranty does not have to say warranty. This statement says ---- Let's step ahead to another issue. I assume you're right that that warning was not approved and is therefore not preempted. What evidence or even what allegations do you have that it was a component part, not the battery, that caused your client's problems? Because Dr. Gerwitz, which you allege, he says he was sending Wildman over to look into getting the battery replaced. Well, they say the device died. There's actually a statement here that's on page four of our complaint. It says Medtronic states the entire device is dead. And they use the word device. And that's where the problem is, is that Medtronic ---- But you don't know which component. You can't identify a component part other than the battery that failed. I can't because Medtronic has the device. After it was removed, Medtronic took it. But do you have experts saying, you know, these are problems generally with these devices. We know this component X is having problems. I mean, even though you don't have the device, people often can find out what the problems are generally with products. And that's the problem with this, is with the 12C motion, which essentially is 12B6, we got knocked out before we could even do discovery. Medtronic has the device. We do have experts lined up. But they have to analyze everything. And Medtronic's presumably downloaded data. And this is the device, is not the battery. And that's why I brought this so we could actually see what we're talking about. It's a computer that's installed inside the body. That little part right there is the battery. You've got microcircuitry. You have the lead wires that run up to the spine, attach to the spine. You have the charger. You have the programmer. This is all part of the device. And if any one of them fail, then the device fails. And so what Medtronic did is they took that tiny little statement from the FDA that says three months to nine years or battery life nine years, and they said, well, our whole device then will work. Nine years. We guarantee it. And that's what this thing is. On the pleading issue, so you've given it your best shot on the pleading. Well, Your Honor, in hindsight, obviously every plaintiff would go, well, somebody's bringing up, well, you could have said this, you could have said that. It's a notice-pleading state. It's not a fraud claim. I know they made a big deal about reliance and, sure, I could have gone this date and this time and this thing, but. Notice-pleading state, but it's governed by the federal rule.  Under Iqbal. Sure. And Twombly. And that is discussed, let me see here, in the Tomas case, which was cited in the brief. And it's just, you know, the plaintiff must plead factual content that allows the court to draw a reasonable inference. Well, this is in the facts section where we talk about what Mr. Wildman did. That statement's there. Then in Clause 9, under the facts section, hey, it's an express warranty. Mr. Wildman relied on this warranty. Right, but when you say, as you just quoted, you have to look at the pleading and see what reasonable inferences can be drawn, that's where I have a concern because Dr. Gurwitz says it's the battery. So doesn't looking at what your allegations have been, the natural conclusion is that the battery went out? Well, the doctor actually couldn't know at that point. But he says, I'm sending him over to Dr. Mina to look into getting his stimulator battery replaced. It doesn't necessarily say the battery went bad. They're just going to try something. And it could be the lead, it could be the charter. There's been other issues here that aren't on the record as far as these devices where different parts can fail. And the device goes. So you're saying to get past Twombly and Iqbal, you just had to allege that the device itself failed, and if they want to assert preemption contending that it has to be the battery, it's their affirmative defense? Well, preemption is going to apply. I think that the judge – Preemption would only apply, your argument is, if it were the battery. At that point you would acknowledge that it would be preempted, right? Well, I disagree with that, although I can understand distinguishing between the battery and the device and saying, well, the battery would be preempted but anything else would not, and that could be a decision that you'll reach in this case. But I would suggest that this statement is so overbroad as to be false and misleading because the FDA never approved a guarantee that the battery is going to last nine years. They said three months – If it had been the battery, there would be no reliance, right? I mean, because it would have been permissible for them just to promote the battery in that manner because that's FDA approved. So if it is a battery defect, how would you have a reliance on the warranty or causation, whichever way you want to look at it? Well, we're talking about a device that is surgically implanted in the body, so if your doctor tells you, well, it might last a few months, it might last nine years, which is a true statement as to what the FDA approved, Mr. Wildman would not have had this device put in. I mean, who wants to go through a whole surgery only to have this thing last for a few months? But when you make a statement like a bumper-to-bumper warranty, like if you buy a car, and this thing, they bill more than most cars cost for this thing to get in, but if you get this bumper-to-bumper guarantee, you sure as heck want your car to last more than a year and a half if they guarantee you the car is going to last. Well, you might want to, but if the FDA, for whatever reason, has looked at the data and says it will, then Medtronic can represent that. Absolutely, Your Honor. If it was approved and if the statement was approved where they state the whole device is going to last, our device is reliable for nine years. They rely heavily on Gomez, AHRQ decision at Gomez, to say even breaches of warranty can run afoul if the contention is that the statement you're disputing is really the safety and efficacy of the whole device. Sure, but Gomez referred to, I think they called it the IFU, that's the information for use of that device. Again, it's looking to the manuals on how to use it. This case is one of the only cases, the only case I've seen, where you're looking at the marketing, the advertising, going way beyond what the FDA approved to the point it is false and misleading. So your theory of tort liability you're saying is premised on an FDA violation, and that being a 352 misbranding? Is that your logic? It is misbranded. That's true, Your Honor. It's a parallel claim also as far as... It's a parallel under Regal. If they were found liable, that would be supportive of the FDA process, not adding to it? Yes, absolutely. But disagree if there's any other aspect to your answer. So really what's going on here is your tort theory reinforces 352, the FDA saying you can't say things beyond what we've approved. That, yes, Your Honor, and the fact that under the law, and it's discussed in the McManus case. Actually, let me... I'm sorry, the Schaust case, which we cite. Which case? The Schaust, S-C-H-O-U-E-S-T versus Medtronic. Right, the district court decision. That's correct. And they talk about, look, and Medtronic concedes that these express warranties can, in certain circumstances, be enforceable. They've got to be truthful, accurate, not misleading, and consistent with applicable federal and state law, and that's what we've got here is they went way beyond what the FDA approved in order to gain a competitive advantage, and they misled. That's getting to the merits, and the problem is, as I see it, even if the district court was wrong on preemption, is the pleadings and the sufficiency of those to get to the whole instrument, not just the battery. I believe you're referring to the reliance part, Your Honor, or which part are you referring to? I'm sorry? Which part of the pleadings were you referring to? The whole thing. It's, you know, there's the part of the pleadings that if you get past the battery And I'm not disagreeing with you, but what we did here is we didn't throw the whole kitchen sink at this case. We stayed specific on express warranty. That's when you run up against Iqbal and Twombly. Well, Your Honor, we put the exact statement in, which is different than all these other cases where Morgan, Hafer, Martin that they all refer to, all they do is refer to vague statements that it didn't comply with these FDA manuals, that it was safe and effective. We said, no, no, no, this is the exact statement. They violated the FDA rules on it. This is false and misleading, and he relied on it. That's really all we need to do in the facts. They're on notice of exactly what our case is. And if I may, Your Honor, it's not unusual for us to get through a round of discovery and then put some more meat into the complaint. Once we get the Medtronic's notes as far as their telephone conversations and their position as to when and how these conversations took place. You're not saying that Iqbal and Twombly doesn't apply at the 12B stage? Well, absolutely it does. It does, Your Honor. But Iqbal and Twombly, they don't require in this situation to have all of your evidence in your complaint. There's got to be some meat on the bones. And the way I read this, it's a skeleton. Your Honor, I understand your position, but I think there's enough meat on this bone when you've got. . . That one quote doesn't carry the whole case. Which quote? The device? If that's the specific express warranty that we're referring to, why get into the other nonsense that all these other cases get into which are just knocked out right and left? I mean, sure, they have big, long complaints, but the courts have been knocking them out because those complaints refer to preemptive. . . The warranty itself is vague in those cases. The allegation is, oh, a doctor told me something about how great this was, but we don't know exactly what was said. Here you're saying at least the representation you've nailed down. Exactly, Your Honor. We're trying to be. . . The cause of the failure, you don't have that nailed down. We can't get it yet, Your Honor, because Medtronic has the device, and sure, we could. . . Did the district court get past preemption to conclude you'd insufficiently pled it, or was that never reached below? Well, we asked in our motion the chance to replete, and they just denied it. They knocked out the case. Right, on preemption, so the court never actually got to that step. Right, on the repleting? Yeah. Right, Your Honor. We didn't have an oral hearing either. They found a Tuamli-Irqbal problem and just said preemption. Yes, I mean, that was their main focus. They didn't get the efficiency of your allegations. Yeah, absolutely, and they put a lot of weight. I mean, you put a lot of weight in this Godfrey case, which refers to a Louisiana, it's a strange case, but it talks about when a warranty can lead to a dangerous product or some unreasonably dangerous product. It's a codified Louisiana law, and it really doesn't apply in this case at all, and it says you must find it's untrue. This is not a case about off-label use, is it? No, Your Honor. There was another item that wasn't brought up in our discussions here, is they bring up a big deal about this limited warranty, which is ironic because a limited warranty is an express warranty. So if we tried to enforce a limited warranty, they might say, well, I'm sorry, this was FDA approved, so you don't get to have your limited warranty. But a limited warranty under the JASO case, which is a Fifth Circuit case, can't be a basis for a 12b-6 or a 12c motion. We're not required to amend our pleadings to address their affirmative defense on it. And their limited warranty, it's interesting because it's got some unusual terms. It's actually in their ROAs. That red light came on. That's all right. Thank you, Your Honor. David Lane for Medtronic.  The controlling principle of law here is established and undisputed, and that is what this Court said in the Bass against Stryker case. A breach of warranty claim is preempted under the MDA if the allegedly breached representation conforms to the labeling that was approved by the FDA in the PMA process. That is the case here. The face of the documents show that the advertising that was supposedly relied upon by the plaintiff and the FDA-approved labeling recognize the same thing, which was that device life and battery life are the same thing for this device, not necessarily for every device, but for this one, and that lifespan is nine years. Because they're the same, the claim is preempted. But isn't the warranty you're making and using to induce consumers to buy your product distinguishing manufacturers who may state their batteries have a longevity greater than nine years, it's important to understand that many other factors and components are involved in determining overall longevity of an implanted device. How do you get around the distinction your very product is making? I don't need to get around the distinction. What the web page was saying is that for some other devices, other components might be the determinative factor of the device's longevity. For the Restore Ultra, it's the battery life that determines the lifespan of the device. And where are you drawing that from in the website representation? You read that to say that it's actually the battery that is all that matters? The battery is the determinative factor, the limiting factor on the lifespan of the device. That's certainly the theory the district court had, but just even looking to your left, if these devices require wires to be inserted into the spine, why isn't it sort of important how long the wires last, too? Well, this is not in the record, but those wires are not part of the device. They're a separate device that are approved under a separate PMA. Well, then what about this sentence? To achieve this distinction, Medtronic rigorously verified and validated the many components that impact device longevity, not just the battery. I just don't see how you read that to say it's just the battery. It says it's not just the battery. Explain to me how you can read that to say it's only the battery. There are other components, like the case, for example, and there are internal wires to the device. And what that webpage is saying is that the lifespan of those other components will at least equal, if not exceed, the lifespan of the battery. Had FDA received data and confirmed that that representation could be made? Well, what FDA received is, I'll read you an example. Now I'm very confused. Your position is that every separate component had its own PMA? No. Or your position is that FDA, for this device, made a Class III determination, the whole thing with all its component parts is safe and effective for nine years? The latter. And the only point I was making about a separate device is about what are called the leads, which are the wires that come out, connect to the body. Those are a separate device. It sounds to me like you're arguing that any time the battery is mentioned, that gets protected, even though it's mentioned in connection with the entire device. In this case, that is, for this device, that is the case, because the failure of the battery results in the failure of the device. You can't have a battery failure without a device failure. It would be a problem under the PMA preemption rules and under ordinary pleading rules if it were otherwise. Well, anything that's run by a battery is subject to that statement. Potentially, but other devices may have other components that might fail earlier or be expected to fail earlier than the battery, and so you might have a device claim that would not depend on the failure of the battery. The statement about this particular instrument mentioned the battery and everything else. The statement in the labeling? Yeah. This is an ROA-111. What it says is that the device reaches end of service, or EOS, nine years after implant. That's because that's when the battery expires. So the labeling equates the overall device life to the battery life. The battery life is the determinative or limiting factor for this device. Your interpretation of what those words mean is subject to other people interpreting it another way. Perhaps, but that's the manufacturer's understanding. If it's all about the battery, why are you trying to tell consumers how reliable the other components are and how much longevity they have? Well, what they were responding to was marketing from other manufacturers that would say, our battery will last for nine years, but other components within that device might fail in less than nine years, and so the consumer would not expect to get a full nine years out of that device. Then you turn around and say, our other components will last nine years. Their answer to that is the FDA has never confirmed on the data you received that's true, and therefore, to the extent that was inaccurate, you've mislabeled it, and their warranty action supports FDA 352. It's concerned not to have things mislabeled. So I want to make two points about that. First of all, FDA did approve the labeling of ROA-111, which says that the overall device life, the end of service of the device, is nine years. Second of all, the misbranding theory is still preempted because Gomez instructs that in assessing preemption under the MDA, we look not to the general label of the claim but to the specific allegations of the claim that's being asserted and the effect that that claim, a successful claim, would have on the PMA requirements. Here, this claim is about the safety and effectiveness of the device, and the FDA determined the device to be safe and effective under the conditions of use. But it isn't really. I mean, that's head note 14 in Gomez, and they aren't saying this device isn't safe and effective as approved. They're saying it might not be safe and effective as it wasn't approved, i.e., cover, wires, all the other parts, eight years out. Well, the device couldn't have been approved if FDA only looked at the battery. It approved the whole device. The PMA determination is for the entire device. That's what the statute says. But it didn't say the device, the component parts are all going to work for nine years. Well, it said that the EOS, the end of service, is nine years. So to get to that conclusion, it has to consider the entire device in reaching that conclusion. What's your best case, circuit case, interpreting Regal this way, that sort of final paragraph that seems to be implicated here, which is the premise on parallels or adds to? Well, there are a number of cases that recognize that claim that it — I'm looking for — I'm sorry? Well, I'm looking for a case that applies Regal as expansively as you want it to, which is to say that once we get approval, that preempts even warranty actions that the plaintiff is arguing support 352. Gomez, in effect, says — Gomez is your best case. Because Gomez says the allegation here is that the representation was false, but that was a representation that was approved by the FDA. Okay, and that all comes back to that record site you've given us, that 111 or 10? 111 in the ROA is where the end of service is stated as nine years. So that's your — the thrust of your argument is FDA approved the entire thing for nine years, and we'll find that at 111? Yes, and I would also refer you to ROA 165 because it elaborates on what end of service means. It states, for example — I'm in the middle of the page under the heading charging system, and it states battery function is not restored when the neurostimulator battery has been over-discharged and restored twice before. The third time the battery is over-discharged, the neurostimulator will reach end of service. End of service is a term that refers to the neurostimulator's life, the entire device's life. And back on 111, the end of service is stated as nine years, because that's when the battery expires. It's pretty voluminous. Yes. Do we have all the data that Medtronic gave to FDA in the record? Can you point to a corresponding part of the record where, in fact, longevity of the various component parts was submitted? The entire PMA record is not in the record of this case, but I think that sufficient materials are in the record of this case. Okay. If there's sufficient materials in the record, can you point to a portion where Medtronic said, and here's the lifetime of the wire, and here's the lifetime of — can you? No. The best I can point to is 111, where it says that the device's life is nine years. Okay. I want to also clarify something, an argument that the plaintiff has made today and in his reply brief about the omissions from the webpage, which has to do with qualifications on the battery life. And I just want to be clear that that's a totally different theory of this case and one that was not presented until the reply brief, and so it's forfeited. The main theory is that the webpage advertising went beyond what the labeling required, but this theory is that it somehow fell short by omitting material information. That's not pleaded, and it was never briefed. It's new in the reply brief, and I just want to be clear that that is a forfeited theory of the case. In addition, I wanted to follow up on the adequacy of the complaint here on a device claim. It is correct that the only component that's even mentioned as a possible culprit for the failure is the battery, and this is not a gotcha point. The failure of the battery and the failure of the device are one and the same thing for this device because the battery is the determinative factor for lifespan. If he could have pointed to something else, maybe that would lead to a different result, but when you have a preempted claim for a battery warranty, and that will necessarily also result in a device warranty violation, assuming that battery life and device life are different things here, you would have the ability to circumvent the MDA's preemption requirements by simply generalizing or making more vague a claim that is actually preempted, and that also runs counter to the thrust of Iqbal and Twombly, which is not a 9B particularity requirement, but at least specific allegations that make the claim plausible. What the plaintiff has done here is they get around preemption only if there's this warranty that goes broader than what the FDA approves. So just speaking hypothetically, if that were the case, of course we're going to rule that way. All you would have to do, you wouldn't have to redesign your product. You would just have to rein in that warranty. Not in this case for a couple reasons. First of all, the allegations are still that the device was not safe and effective. The allegations are that it malfunctioned, it quit working, it failed to alleviate the pain for which it was prescribed, and it caused him a physical and emotional injury. That is what safety and effectiveness is about. So this claim would declare that the device was not safe and effective under the conditions of use prescribed in the labeling that was approved by the FDA. That's preempted not only under the MDA. It's preempted under ordinary conflict preemption rules because it would ask the court to make a determination under state law that is counter to the FDA's determination. But in addition, Texas law of expressed warranty, the theory of a warranty claim is that the device shall conform to the representation. So his claim is that the device should have lasted longer than it did, should have been safer than it was. His claim isn't really the malfunction one at the moment. He's saying I was misled into accepting this. Your advertising worked exactly as you intended it to. I didn't buy a competitor's product. I bought yours. That is his theory. Because you mislabeled it. And I don't see how that's adverse to any safety and effectiveness finding. Well, in this case, what he's saying is that because the device did not conform to that representation, it failed prematurely, it malfunctioned, so it didn't work. And it hurt him. He suffered physical and emotional injuries. And the FDA has found this device to be safe and effective. And the only cases that I have found... I would swallow all expressed warranty actions then. Your interpretation of regal. No, I don't think it would. At a minimum, we could distinguish off-label uses and warranties, which arguably are not found to be safe and effective by the FDA. I mean, I'm not fully conceding that, but I think it's a different world. And all of the cases that have concluded that an expressed warranty claim was not preempted involved off-label use, every single one of them that I have found and that has been cited in this case. Just on the pleading issue, your 12C motion, if I'm correct, below, you didn't say it was insufficiently pled because it didn't name the other components that might have failed. You claimed that there was no reliance. That is an argument that we made. I don't recall if we specifically articulated the theory that the only component that was identified was the battery. But we did argue that the thrust of the complaint was a battery life warranty claim. And that is what the district court found, that it was a battery life warranty claim and that that's the same, functionally the same as what the labeling said because they are both expressing the concept that the battery life determines the device life for this device. You said earlier, and of course it's true, that if the battery fails, the whole device is going to fail. But is it possible for other component parts to fail with the battery fully functioning? I believe it is, but I'm not certain of that. And there's nothing in the record that speaks to that. At this stage of the case, you have the device. What information does the plaintiff have access to that will allow it to make an allegation of what failed? I don't know what information he has access to. He may not have the device. Whether he has access to an expert who can educate him about it, I don't know. But Twombly and Iqbal, there may have been a time when a plaintiff would come into court and say, I can't fully plead a claim, but I need discovery and then I can figure out whether I can have a claim. Twombly and Iqbal closed the door on that. They are explicit that the door to discovery, Iqbal even says, the door to discovery and the entitlement to discovery depend upon a validly pleaded claim, one that plausibly suggests a valid legal claim. And this complaint does not meet that standard. And he can't go and get discovery first to be able to fill in the gaps in his complaint. Your Honors, if there are no further questions, I have nothing further. There was a statement, Your Honors, that he said that I was very surprised that he would state to the court, he said the leads are not part of the device. And you all caught on to it really quick. The device doesn't work without the leads being attached. And yes, there's absolutely so many parts of these components that can go wrong. And the FDA did not approve exactly what we've been talking about, this nine-year life on any of these components. So their bold statement is false, it's very misleading, and it creates kind of in their argument also that, well, you didn't properly plead, it creates a catch-22 for the plaintiff. Now, how are we supposed to plead and put more meat on the bones without having access to the device, which Medtronic took after the surgery? We can't test it, we can't analyze it, we can't download the data from it, which presumably they did at this point in the game. Now, if we were allowed to go back to the district court, absolutely, game one is what we would do is we'd start looking at this evidence. But how can the plaintiff be penalized for not having this additional information as to what precisely went wrong and caused this to fail? But there's no doubt when Medtronic, and it's in our pleadings, and the doctors, there's no doubt that they said the device failed, it absolutely died, and it had to be removed. And this was some years after the device was installed. They make a big deal about this, well, the end of service is nine years. That does not say that the device is guaranteed for nine years or mimic any of this language, which is really strong. And it's not just, well, we think it'll last nine years, it says the result is a rechargeable stimulator that delivers reliable performance over the entire period of predicted service. That's an affirmative positive statement. That's not wishy-washy, and that's what Mr. Wildman states. What about his statement that the stimulator is essentially the battery, that that's what determines the effectiveness of the stimulator? Well, you need a battery to work, but you also need every other part to work. If this fails, if the charger fails, if any of this microcircuitry, when we all have computers and any little part of that computer fails, it goes down. It could be a software issue, it could be all kinds of glitches. So how can they? When he cites 111 and 165 and the FDA approved statements there, it's your position that looking at them closely in context, they're exclusively focused on the battery life? He's picking and choosing some things there. Yes, I believe so. I'd have to look at that 111 there. But I'm looking at 113 in the ROA, and it says the battery of an implantable neurostimulator can last four months or years depending on the following factors. Do they disclose that to Mr. Wildman? Absolutely not, because that would hurt their marketing. But a lot of these factors are not under the control of even Mr. Wildman. It talks about the program parameters, which are set by the doctors, and Medtronic reps actually do these settings, the system impedance, hours per day of stimulation. You mentioned that the record does contain portions of the PMA filing. Do you know whether or not it contains any evidence about the longevity of non-battery components? I saw absolutely nothing. And I'm sure they would have brought it up in their brief and pointed out with a big star next to it saying, hey, look, here's some components that were approved. Everything that we've seen so far, it just points to those tiny little statements that are contrary to their nine-year device life, what we call the warranty. So I think everybody's got a good grasp of the subject matter. So in closing, what we would ask, Your Honors, is the chance to go back to the district court, allow us the chance to prove our case, and hold Medtronic to their guarantees of their product. Thank you. Thank you.